# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

KARI MANS,
        **Plaintiff,**

    **v.**                           **Case No. 25-cv-505**

ROTE OIL LTD.,
        **Defendant.**

---

## DECISION AND ORDER

Plaintiff Kari Mans ("Mans") filed this action against defendant Rote Oil Ltd. ("Rote") alleging interference with Family Medical Leave Act ("FMLA") benefits, retaliation for using FMLA benefits, and disability discrimination under the Americans with Disabilities Act ("ADA"). Mans asserts that she was fired, while Rote asserts that Mans resigned. Mans and Rote offer cross motions for summary judgment. For the reasons that follow, both parties' motions for summary judgment are denied.

## I. BACKGROUND

The following facts are undisputed unless otherwise noted. Mans was hired by Quality State Oil, Inc., in Sheboygan, Wisconsin, in October 2018 as a Lubricant Coordinator. (ECF No. 37, ¶ 1.) In this role, Mans performed administrative tasks such as taking calls from customers, sourcing products, dispatching drivers to deliver products, receiving invoices, and reconciling inventory. (*Id.* ¶ 4.) Quality State Oil was acquired by Rote Oil in September 2021 and Mans continued in her role as a Rote employee. (*Id.* ¶ 2; ECF No. 43, ¶ 1.) Rote is a wholesaler of various fuel products. (ECF No. 43, ¶ 1.) At this time, Mans's supervisor was Brenda Kievit ("Kievit"). (*Id.* ¶ 3.)

In 2022, Mans was diagnosed with non-small cell lung cancer and that same year had a lobe of her right lung removed. (ECF No. 37, ¶¶ 8–9.) Mans's doctors later determined that her lung condition was caused by inflammation rather than cancer. (*Id.* ¶ 10.) Since this surgery, Mans has struggled with breathing and environmental triggers such as dust, mold, and cold infections. (*Id.* ¶¶ 11–18.) Mans requested and received FMLA leave from July 8, 2022, to August 22, 2022, while she underwent surgery and recovered. (*Id.* ¶ 21.) During that period, coworker Jim Gaugar handled many of Mans's tasks. (*Id.* ¶ 23.) Mans came to work on four to six days during her FMLA leave to help the office get caught up. (*Id.* ¶ 24.)

At some point in 2023, another employee Kathy Paris also began treatment for cancer. (*Id.* ¶ 28.) Paris continued to work but took several days off after receiving chemotherapy. (*Id.* ¶¶ 31–33.)

On August 16, 2023, Mans underwent a regular CT scan to look for issues with her lungs. (*Id.* ¶ 36.) On August 21, 2023, her oncologist told her that the scan seemed to reveal metastatic cancer. (*Id.* ¶¶ 35–36.) To be sure, the oncologist ordered a follow-up PET scan to confirm. (*Id.* ¶ 37.) Meanwhile, Mans informed Human Resources Manager Kate Kobs ("Kobs") of her medical situation and requested FMLA and life insurance paperwork. (ECF No. 43, ¶¶ 23–31.)

On September 12, 2023, Dr. Nicholas Gustafson informed Mans that she had stage four cancer and that she would die within a year without treatment. (*Id.* ¶ 32.) Mans then told her supervisor Brenda Kievit ("Kievit") and other coworkers of her diagnosis. (*Id.* ¶ 34.) Mans told Kievit that she expected to take time off under FMLA, and that she would not come in to work during that leave the way she had in 2022. (ECF No. 37, ¶ 52.) Mans

2

also told Kievit to look for a replacement for her role "sooner rather than later" because she "didn't want to work anymore" and wanted to be "done." (*Id.* ¶ 55; ECF No. 23, ¶¶ 9, 13.) Mans intended to work until Rote found a replacement so as to not leave the office shorthanded or leave her coworker Jim Gauger, who covered for her in 2022, with too much work. (ECF No. 37, ¶ 67.) Kievit did not ask Mans to clarify what exactly she meant by "done," because she felt it "would be heartless" to ask. (*Id.* ¶ 60; ECF No. 23, ¶¶ 14–16.)

On or around September 20, 2023, Mans told Kievit that she "needed to be done working sooner [rather] than later to take care of my life things" before her cancer treatments started. (ECF No. 37, ¶ 80.) In response, Kievit asked Mans: "are you going to leave us high and dry?" (*Id.* ¶ 81.) Kievit also appeared "upset" when Mans mentioned that her FMLA paperwork, which her doctor backdated to September 1, showed that she was incapacitated and should already be on leave. (*Id.* ¶¶ 76, 82.) Mans felt pressure to continue working longer and agreed to work until September 29, 2023. (*Id.* ¶ 84.) She later offered to work through October 6, 2023, to accommodate Jim Gauger's preplanned vacation. (*Id.* ¶ 85.)

Kievit told HR Manager Kobs that Mans "no longer wanted to work for us." (*Id.* ¶ 86.) The next day, Rote posted a job notice for a Lubricant Coordinator position on the job website Indeed. (*Id.* ¶ 87.) Mans was aware that this advertisement was for a permanent position, but was not concerned. (*Id.* ¶ 88.) She believed that the FMLA and Rote's employee handbook guaranteed her a comparable job if she returned from leave, even if it was not the same job she had before taking leave. (*Id.* ¶ 89.) On September 22,

2023, Rote's human resources department approved Mans's application for FMLA leave through December 20, 2023. (*Id.* ¶ 90.)

On October 4, 2023, Mans received a call from Dr. Jonathan Thompson, an oncologist at Froedtert Hospital. (*Id.* ¶ 92.) He told Mans that further testing indicated that she likely did *not* have stage four lung cancer, although they could not yet be sure. (*Id.* ¶ 93.) Mans told Kievit her new diagnosis the next day. (*Id.* ¶ 94.) Kievit asked if this new diagnosis changed her position on working, and Mans told her: "I have no intentions of not working. I want my job. I need my job." (*Id.* ¶¶ 94–98.)

Kobs reached out to Mans to discuss her medical status by text message on October 8. (*Id.* ¶ 101.) Kobs asked Mans to formally update her medical status given that she appeared not to have cancer. (*Id.* ¶ 105.) Mans replied that her stage four cancer diagnosis was "still in place" and "nothing is certain" until her primary oncologist, Dr. Gustafson, could confirm the second opinion. (*Id.* ¶¶106, 108.) She stated that her oncologist did not want to miss an opportunity for treatment if the second opinion turned out to be wrong. (*Id.* ¶107.) On October 9, Kobs told Mans by text message to come to work the next day, Tuesday, October 10, to perform her normal job. (*Id.* ¶ 112.) On October 12 in a meeting with Kievit and Kobs, Mans was given a letter stating that "Rote Oil Ltd has accepted your resignation." (*Id.* ¶ 118.) Mans protested, arguing that she did not resign. (*Id.* ¶ 121.) Rote maintains that Mans was "separated" from the company by accepting her resignation because it had already hired her permanent replacement, for business reasons, and the overall benefit of Rote Oil's Sheboygan Office. (*Id.* ¶ 117; ECF No. 43, ¶ 112.)

## II. LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On the defendant's motion for summary judgment, I must view the evidence in the light most favorable to the plaintiff and enter judgment only if no reasonable factfinder could find for plaintiff at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986). On the plaintiff's motion for summary judgment, I likewise view the evidence in the light most favorable to the defendant. *Id.* This court's local rules require that each moving party submit a statement of proposed material facts that the moving party contends are not genuinely disputed. *See* Civil L.R. 56(b)(1) (E.D. Wis.). The other party then must respond to each proposed fact and may file a statement of additional facts. *Id.* Each party must cite to the evidentiary record to support its position that a particular fact is disputed or undisputed. *Id.*; *Senske v. Sybase, Inc.*, 588 F.3d 501, 503 n.1 (7th Cir. 2009) (The court may deem facts as admitted where the opposing party "improperly characterizes facts as disputed without citing evidence that directly contradicts" the proposed fact.).

A party may dispute the other's proposed fact by pointing to evidence in the record that shows the fact to be genuinely disputed. Fed. R. Civ. P. 56(c)(1). Evidence that would not be admissible at trial, such as hearsay testimony outside of any hearsay exception, may not be considered on summary judgment. *Prude v. Meli*, 76 F.4th 648, 661 (7th Cir. 2023). The existence of cross motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Services, LLC v. Int. Union of Operating Engineers*, 335 F.3d 643, 647 (7th Cir. 2003). "Parties have different

burdens of proof with respect to particular facts; different legal theories will have an effect on which facts are material; and the process of taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail without a trial." *Id.* at 648.

## III. DISCUSSION

The Family Medical Leave Act ("FMLA") guarantees every eligible employee 12 workweeks of leave during any 12-month period because of, among other reasons, "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Upon returning, the employee must be restored to their previous position or an equivalent position with equivalent benefits, pay, and other conditions of employment. 29 U.S.C. § 2614(a)(2). FMLA leave is generally unpaid, but the employer must maintain the employee's health insurance plan and continue paying the employer's portion of the premium. § 2614(c)(1). The FMLA prohibits covered employers from interfering with an employee's FMLA rights and prohibits retaliation against an employee for exercising her FMLA rights. § 2615(a)(1) & (a)(2). An employee who suffers FMLA interference or retaliation has a cause of action to recover damages in court. § 2617(a)(2).

### A. FMLA Interference

To prove a claim for FMLA interference, the plaintiff employee must show that (i) she was eligible for FMLA protections, (ii) the defendant employer was covered by the FMLA, (iii) she was entitled to leave under the FMLA, (iv) she provided sufficient notice of intent to take FMLA leave, and (v) the employer denied or interfered with FMLA benefits to which she was entitled. *Ziccarelli v. Dart*, 35 F.4th 1079, 1084 (7th Cir. 2022). No

6

discriminatory intent is needed to prove a claim for interference. *Myers v. Sunman-Dearborn Community Schools*, 142 F.4th 527 (7th Cir. 2025). It is undisputed that Mans satisfied the first four elements. ECF No. 20 at 15. Both Mans and Rote argue that there is no genuine dispute of fact as to element five. Mans argues that there is no dispute she was fired, while Rote argues that there is no dispute she resigned. If she was fired while preparing to take protected leave, Mans would succeed in showing Rote interfered with her FMLA benefits. *See Burnett v. LFW Inc.*, 472 F.3d 471, 478 (7th Cir. 2006). If she voluntarily resigned, she could not show FMLA interference because she would no longer be entitled to FMLA benefits. *See Ziccarelli v. Dart*, 142 F.4th 477, 490 (7th Cir. 2025); *Curby v. Solutia, Inc.*, 351 F.3d 868, 872 (8th Cir. 2003) ("An employee cannot submit a resignation and then claim the employer's acceptance of the resignation is an adverse employment action.").

Contrary to both parties' arguments, there is a genuine dispute of fact as to whether Mans resigned. All agree that Mans never formally drafted a resignation letter or stopped showing up for work. Rather, Rote asserts that Mans made a series of statements about her medical prognosis and employment expectations that manifested an intent to resign. Mans told her coworkers that she "wanted to be done and not work on [her] good days" rather than work part time as she had done in 2022 while on FMLA leave. (ECF No. 46, ¶ 43.) She told several customers that she would soon be unavailable, telling Kathy Porter at Sargento Foods: "Just letting you know I will only be here a bit longer unfortunately (Maybe another week). I found out my lung cancer has returned and I am going a different direction with life. We possibly have a replacement hired soon." (*Id.* ¶ 70.) Mans told Kievit that she "needed to be done working sooner [rather] than later to take care of my life

things." (ECF No. 37, ¶ 80.) Mans encouraged Kievit to hire a permanent replacement for her position rather than a temporary replacement, but stated that she ultimately was worried about her health and not about how they filled the role. (ECF No 43, ¶¶ 48–49.) She even helped Kobs draft the job description for her permanent replacement. (*Id.* ¶¶ 53–54.) Rote offers further disputed statements from other employees who believed that Mans had resigned or who allege that Mans told them she was resigning. (*Id.* ¶¶ 76, 78, 84, 86, 87, 90.)

After learning that she may not have cancer and Rote had hired a permanent employee to file Mans's role, but before she was "separated," Mans made additional undisputed statements. She texted Kobs and said "I wish you all would have gone [with] the temp like [Kievit] first said. This wouldn't be so crazy." (*Id.* ¶ 93.) She further told Kobs "I would have never considered leaving if I wasn't Stage 4 cancer." (*Id.* ¶ 95.)

Mans offers additional context to these statements. She avers that her stated desire to not work part time on her "good days" referred only to the days during cancer treatment that she expected to be well enough to work. (ECF No. 42, ¶ 7.) She suggested Rote hire a permanent employee rather than someone temporary only because her return date "was not entirely certain" and she believed that FMLA guaranteed her a comparable job after returning from leave. (*Id.* ¶ 16; Mans Dep. 106:2–8.) She denies that she resigned and notes that she knew FMLA requires the employer to maintain an employee's health benefits while on leave. (ECF No. 42, ¶ 24.) If she voluntarily quit, her employer health benefits would end and she would have to pay the entire premium herself. *See* 29 C.F.R. § 825.311(b). In fact, Mans's health insurance costs under COBRA after she was "terminated" rose from approximately $510.00 per month to $2,032.47 per month. (ECF

8

No. 42, ¶¶ 25–26.) It would not have been rational for Mans to resign shortly before taking protected leave, although as Rote points out, people facing stressful circumstances do often make irrational decisions. The same logic shows that Rote would stand to receive a windfall if Mans conveniently resigned shortly before taking FMLA leave. Without giving undue weight to what is merely an implication, the foreseeable consequence of resigning might lend weight to Mans's testimony that she did not resign.

In light of all the evidence, there is a genuine dispute as to whether Mans resigned or was fired. The Code of Federal Regulations offers some guidance on drawing the line between an employee who has resigned and one who has not:

> If an employee gives unequivocal notice of intent not to return to work, the employer's obligations under FMLA to maintain health benefits (subject to COBRA requirements) and to restore the employee cease. However, these obligations continue if an employee indicates he or she may be unable to return to work but expresses a continuing desire to do so.

29 C.F.R. § 825.311(b); *see also Moncion v. Flat Rate Movers, Ltd.*, No. 21-cv-2865, 2023 WL 2537778, *2 (S.D.N.Y. Mar. 16, 2023) (applying § 825.311(b)); *Ortmeier v. First Nat. Bank of Omaha*, No. 8:21-cv-92, 2023 WL 6850482, *3 (D. Neb. July 24, 2023) (same). Viewed in the light most favorable to Mans, with all reasonable inferences drawn in her favor, I cannot say that she gave unequivocal notice of intent not to return to work. Her statements are subject to multiple interpretations, including one where she intended to take leave even on her "good days" between cancer treatment sessions, but ultimately return if she recovered.

Likewise, there is a view of the evidence that Mans *did* give unequivocal notice of intent not to return. Viewed in the light favoring Rote, her earlier insistence on a permanent replacement, coupled with wanting to go a "different direction" in life and not

9

spend her final "good days" working, could be seen as expressing that she intended not to return. And the statements Mans made after learning that she may not have cancer could be discounted as an attempt to take back a resignation she later regretted. A reasonable jury could make either finding, so the question must be reserved for trial.

Rote raises two alternative arguments for summary judgment in its favor on the interference claim. (ECF No. 20 at 15–16.) Neither are compelling. First, Rote asserts that it could not have interfered with Mans's FMLA leave because she was not undergoing treatment or on leave at the time of her separation. *Id.* ("Plaintiff cannot now argue that Rote Oil interfered with any planned use of FMLA leave because it is undisputed that Plaintiff was not undergoing any treatment and was not on leave at the time of her separation from employment with Rote Oil."). But if a jury could find that Mans was fired and did not resign, then the jury could also find that Rote interfered with her FMLA benefits by firing her shortly before she could use them. Taken in the light most favorable to Mans, there is a genuine dispute as to whether Mans may still have needed protected leave to confirm her tenuous cancer diagnosis and receive treatment. (ECF No. 43, ¶ 114; ECF No. 46, ¶¶ 57–59.) Claims of FMLA interference would be a dead letter if interference was actionable only when it occurs during a period of protected leave. If true, the employer could defeat an interference claim by engaging in quintessential interference: preventing the employee from commencing leave.

Second, Rote argues that it could not have interfered with her right to be restored to an equivalent job upon returning from leave because she never began taking leave. The FMLA provides that "any eligible employee who takes leave . . . shall be entitled, on return from such leave—to be restored by the employer to the position of employment

10

held by the employee when the leave commenced [or an equivalent position]." 29 U.S.C. § 2614(a)(1). But "[f]iring an employee to prevent her from exercising her right to return to her prior position can certainly interfere with that employee's FMLA rights." *Simpson v. Office of Chief Judge of Circuit Court of Will County*, 559 F.3d 706, 712 (7th Cir. 2009). It is undisputed that after Mans received her cancer diagnosis, she gave proper notice that she would soon require FMLA leave to pursue treatment. 29 U.S.C. § 2612(e)(2). Rote prepared for her absence by hiring a replacement employee. After the replacement employee was hired, but before Mans began leave and the replacement employee began work, Mans learned that she may not have cancer and walked back her FMLA leave request. The fact that Mans sought to retain, rather than return to, her job after her cancer diagnosis changed because the news came before her leave began is irrelevant. *See* 29 U.S.C. § 2615(a)(1) (prohibiting interference with the exercise of, *or the attempt to exercise*, any right under the FMLA); *Dalpiaz v. Carbon County, Utah*, 760 F.3d 1126, 1132 (10th Cir. 2014) ("[A]n interference claim arises when an adverse employment decision is made before the employee has been allowed to take FMLA or while the employee is still on FMLA leave."). I accept Rote's point that the plain language of the FMLA presumes an employee will always take leave before seeking reinstatement. *See* 29 U.S.C. § 2614(a)(1) (". . . return from such leave . . ."). But it would be nonsensical to conclude that an employee who recovers from a serious medical condition before starting leave has no comparable right to retain their job. *See Chitwood v. Ascension Health Alliance*, 168 F.4th 493, 497 (7th Cir. 2026) (citing *Guzman v. Brown County*, 884 F.3d 633, 640 (7th Cir. 2018); *Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018))

11

(implying an interference claim may arise if the plaintiff is terminated after FMLA leave is *requested*, not *taken*).

Therefore, there are genuine disputes of fact as to plaintiff's FMLA interference claim, so summary judgment as to that claim on the cross motions is denied.

## B. FMLA Retaliation

I found above that there is a genuine dispute of fact on whether Mans was fired or whether she resigned. Under the FMLA, an employee's unlawful termination could be interference, retaliation, or both. Interference requires the frustration of substantive FMLA benefits, while retaliation requires some adverse action taken because an employee invoked their FMLA rights. *Kauffman v. Federal Express Corp.*, 426 F.3d 880, 884–85 (7th Cir. 2005) (an employer commits interference when it fires an employee "*in spite of*" his rights under FMLA rather than "*because*" he asserted those rights.).

To prove a claim for FMLA retaliation, Mans must show that (1) she engaged in a statutorily protected activity, (2) the employer took adverse action against her, and (3) the protected activity was a "substantial or motivating factor in the employer's decision" to take the adverse action. *Chitwood*, 168 F.4th at 498; *Goelzer v. Sheboygan County, Wis.*, 604 F.3d 987, 995 (7th Cir. 2010). That final element is the key distinction between interference and retaliation. A retaliation claim must be supported by evidence of retaliatory *intent*.

In the absence of direct evidence of retaliation, an employee may rely on the *McDonnell Douglas* burden-shifting framework to show retaliatory intent. *King v. Preferred Technical Group*, 166 F.3d 887, 892 (7th Cir. 1999) (citing *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 800–06 (1973)). Under this framework, the employee must first

12

make a *prima facie* showing of discriminatory intent. *Id.* Next, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* Finally, the burden shifts back to the employee to show (with evidence) that the employer's proffered reason is merely a pretext for discrimination. *Id.* To do so, the employee must show both that the reason was false and that discrimination was the real reason. *Id.* at 893 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)).

As discussed above, there is a genuine dispute of fact as to whether Mans suffered an adverse employment action. A reasonable jury could find that she was fired, and being fired is the quintessential adverse employment action. Rote successfully shifted the *McDonnell Douglas* burden back to Mans by offering that its true reason for "separating" her was to accommodate the employee it hired to permanently replace Mans who had already given notice to his or her previous employer.[1] (ECF No. 43, ¶¶ 79, 105–108.)

Mans offers some evidence to support a finding of retaliatory intent. In September 2023, Kievit asked Mans if she would leave the office "high and dry" by leaving before her replacement was arranged. (ECF No. 37, ¶ 81.) Kievit also may have suggested that Mans should work through her cancer treatments, stating "that is what people with cancer do, they work." (ECF No. 46, ¶¶ 33–34.) To be sure, other undisputed evidence cuts against a finding of animus. Mans believed at the time that her coworkers, including Kievit, were genuinely concerned for her health and wellbeing. (ECF No. 43, ¶ 36.) It is also undisputed that the other decisionmakers Kobs and Dave Schwartz (the owner of Rote)

---

[1] Rote's boilerplate explanation of "business reasons and the overall benefit of Rote Oil's Sheboygan Office" is conclusory, but a jury could find this to be true from the undisputed fact that Rote now had two employees and only one vacant Lubricant Coordinator position. A vague claim of "business reasons," unsupported by evidence that elaborates on what those reasons might be, would otherwise not be enough to shift the burden back to the employee.

never expressed animus toward Mans and were told by Kievit that Mans had unequivocally resigned. Viewed in the light most favorable to Mans, these statements could lead a jury to find that Kievit herself may have felt animus toward Mans after she invoked her FMLA rights.

Rote correctly states that "faulty reasoning or mistaken judgment on the part of the employer" is not evidence of pretext. *Burton v. Bd. of Regents of U. of Wis. Sys.*, 851 F.3d 690, 698 (7th Cir. 2017) (citing *Harden v. Marion Cty. Sheriff's Dep't*, 799 F.3d 857, 864 (7th Cir. 2015)). The undisputed evidence shows that Kobs and Schwartz were, at best, mistaken about Mans's intentions. Therefore, Mans has not shown that *their* reasoning was pretext. But the record shows that Kievit and Schwartz jointly made the final decision to separate Mans. (ECF No. 43, ¶ 109.) If a jury could find that Kievit had retaliatory intent, the jury could fairly conclude that her continuous involvement in the saga, from Mans's initial notice to Rote's final decision to let Mans go, had made Rote's reasoning pretextual.

Therefore, there are genuine disputes of fact as to plaintiff's FMLA retaliation claim, so summary judgment as to that claim on the cross motions is denied.

## C. ADA Discrimination

Mans's final claim is for discrimination under the Americans with Disabilities Act ("ADA"). 42 U.S.C. § 12112(a). To succeed, Mans must prove (1) she is disabled; (2) she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodations; (3) she suffered an adverse employment action; and (4) the adverse action was caused by her disability. *Kurtzhals v. County of Dunn*, 969 F.3d 725, 728 (7th Cir. 2020). Rote concedes that the only element in dispute is the fourth—

14

whether Rote's reason for terminating Mans was discriminatory and pretextual—and that the analysis is essentially the same as for FMLA retaliation. (ECF No. 20 at 28.)

A "serious health condition" under the FMLA is not synonymous with a "disability" under the ADA. *Burnett v. LFW, Inc.*, 472 F.3d 471, 483 (7th Cir. 2006). But neither party disputes that non-small cell lung cancer and its associated treatments would almost certainly "substantially limit[] one or more . . . major life activities." 42 U.S.C. § 12102(2). Therefore, if Mans could prove FMLA retaliation, she could also prove ADA discrimination. I concluded above that summary judgment is inappropriate on the question of pretext and discrimination, so I must withhold summary judgment on Mans's ADA claim.

## IV. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the parties' cross motions for summary judgment (ECF Nos. 19, 31) are **DENIED**. The court will set a status conference to discuss further steps.

Dated at Milwaukee, Wisconsin, this 13th day of May, 2026.

/s/Lynn Adelman
LYNN ADELMAN
United States District Judge

15